Nancy ALLISON, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–752C.

United States Court of Federal Claims.

Nov. 3, 1997.

James M. Baumgartner, Portland, OR, for plaintiffs.

Domenique Kirchner, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Michael P. McCarthy, United States Department of Veterans Affairs, of counsel.

## ORDER

MILLER, Judge.

This case is before the court after argument on defendant's motion for summary judgment. The issues to be decided are 1) whether the United States Department of Veterans Affairs violated the Equal Pay Act, 29 U.S.C. § 206(d) (1994), by paying predominantly female nurse practitioners lower salaries than those received by predominantly male physician assistants for equal work performed under equal or substantially equal conditions, and 2) if a violation of the Equal Pay Act did occur, whether it was willful so as to permit plaintiffs to avail themselves of the applicable 3–year statute of limitations.

## FACTS

The following facts are undisputed, unless otherwise noted. Prior to December 1990, both physician assistants ("PAs") and registered nurses, a broad group encompassing nurse practitioners ("NPs"), employed by the United States Department of Veterans Affairs (the "VA"), were compensated pursuant to 38 U.S.C. § 7404 (1994).[1] However, in December 1990, PAs at the United States Department of Veterans Affairs Medical Center in Portland, Oregon (the "Portland VAMC"), were granted a special salary rate authorization because of documented recruitment and retention difficulties.[2] The special salary rate authorization was established pursuant to 38 U.S.C. § 7455(b) (1994), and currently remains in effect.

In April 1991 all NPs employed by the VA fell under the ambit of the Nurse Pay Act of 1990, which compensated NPs pursuant to a system known as the "nurse locality pay system." 38 U.S.C. § 7451 (1994). The nurse locality pay system establishes salary scales based on surveys of nurses' salaries in local private sector facilities comparable to the local VA establishment. The Nurse Pay Act explicitly excludes PAs who remain under a nationwide compensation system.

Plaintiffs note that the locality pay system was established to ensure that the NPs at VA facilities across the United States would receive compensation comparable to that of their colleagues at private sector facilities located in the same job market. To determine the VA's competitiveness with local private sector employers, the VA is required to undertake periodic surveys to determine relative levels of compensation. If these surveys indicate that VA NPs are not receiving comparable wages, the VA will adjust the locality pay to reduce the discrepancy between the public and private sector salaries. The VA, however, is not permitted to be the market leader in terms of compensation.

Plaintiffs contend that the locality system governing nurses' wages is similar to the system used to determine whether VA PAs are entitled to a special salary adjustment. In fact, plaintiffs maintain, and defendant disputes, that the mechanism is identical, although plaintiffs admit that the locality system—unlike the mechanism used to adjust PA salaries—is intended only to ensure comparable salaries for nurses and is not necessarily dependent on staffing difficulties. Nonetheless, plaintiffs argue that the VA may create individual pay scales for subgroups of nurses, such as NPs, when local conditions dictate such a response.

Conceding that the VA, under certain circumstances, may establish pay scales for subgroups of nurses, such as NPs, defendant takes the position that VA facilities derive the authority to create these special salary rates from VA Cir. 00–93–7 (Mar. 7, 1995). According to defendant, in order to exercise this discretionary authority, the VA must have documented recruitment and retention problems of the nurse subgroup for which it is seeking the special salary adjustment.

As of 1994 Nancy Allison, Louise Hope, Melody Rasmor, Sue Runtz, Gail Sakuma, Fran Sinnema, Corrie Stevens, Arlene Strong, and Joyce Zuber ("plaintiffs") were employed, or had been employed, by the Portland VAMC as NPs. In February 1994 plaintiffs informed a Portland VAMC equal employment opportunity counselor that they were the victims of sex–based discrimination. The basis of this allegation was that the VA paid predominantly female NPs lower salaries than those received by predominantly male PAs. On April 1, 1994, each of the 9 plaintiffs filed a complaint with the VA stating:

> Veterans Administration nurse practitioners. who are predominantly female, are paid less than Veterans Administration physician assistants, who are predominantly male. Nurse practitioners perform work equal or substantially equal to that of

1. The scope of this pay schedule is nationwide.

2. In support of a special adjustment, the Portland VAMCs presented the VA with a survey of 72 PAs employed at local private sector facilities. Apparently, 68 of the PAs were employed by

Kaiser Permanente, which was portrayed as the Portland VAMC's primary competitor. The PAs and NPs at Kaiser are paid identical salaries because of a 1988 Equal Pay Act claim brought by Kaiser NPs.

physician assistants and the performance of their job involves skill, effort, responsibility, and working conditions equal to or substantially equal to that of physician assistants. The violation is continuing.[3]

When plaintiffs filed their respective claims with the VA on April 1, 1994, each was being compensated at the Grade III level of the nurse locality pay system. Grade III contained 12 separate salary steps ranging from $41,959.00 to $55,797.00. Plaintiffs argued that the comparable salary rate for PAs employed by the Portland VAMC was Senior Grade. Because the Portland VAMC PAs were being compensated pursuant to the special salary scale established in December 1990, Senior Grade encompassed 10 separate steps ranging from $45,214.00 to $57,544.00. Had the special salary scale not been in place, the steps contained within the Senior Grade level would have ranged from $41,-104.00 to $53,434.00.

In May 1994 the VA dismissed plaintiffs' claims, finding that they were not aggrieved persons as contemplated by the Equal Pay Act. Thus, according to the VA, were plaintiffs to prevail, the VA could grant no relief because it lacked the authority to deviate from the congressionally mandated separate pay schedules governing NPs and PAs, respectively. The Equal Employment Opportunity Commission (the "EEOC") reversed this finding on November 4, 1994. The EEOC determined that plaintiffs did have standing as aggrieved persons under the Equal Pay Act and remanded the matter to the VA. On August 31, 1995, an EEOC investigator determined that neither the Equal Pay Act nor Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e–17 (1994), had been violated. Plaintiffs subsequently filed the instant lawsuit on November 14, 1995.

Argument revealed that defendant's ability to prevail was dependent primarily on plaintiffs' ability to document the Portland VAMC's difficulty in recruiting and retaining qualified NPs. The affidavit submitted by Arlene Strong was, without further support, insufficient to preclude an entry of summary judgment in favor of defendant. However, because defendant raised in its reply brief the issue of recruitment and retention difficulties, and because defendant had submitted new affidavits with its reply, plaintiffs were granted the opportunity to conduct limited discovery to obtain evidence illuminating the Portland VAMC's problems in recruiting and retaining NPs and to file a sur–reply. Plaintiffs conducted depositions of several Portland VAMC officials and provided, with their sur–reply, further affidavits supporting their contention that recruitment and retention problems were present during the period at issue.

## DISCUSSION

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, or facts that might significantly affect the outcome of the suit under the governing law, preclude an entry of judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the moving party has met its burden, the non-movant must raise " 'specific facts showing that there is a genuine issue for trial.' " Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)).

To meet its burden, "[t]he non-movant may not rest on its conclusory pleadings but, under Rule 56, must set out, usually in an affidavit from one with knowledge of specific facts, what specific evidence could be offered at trial." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1562–63 (Fed. Cir.1987). "If the evidence [of the non-movant] is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249–50, 106

---

3. Just prior to the filing of the nine complaints, in March 1994, the Portland VAMC employed 25 NPs; 19 were female. The Portland VAMC also employed 15 PAs, 5 were female.

S.Ct. at 2511 (citations omitted). Any evidence presented by plaintiffs will be believed and all justifiable inferences will be drawn in their favor. *Id.* at 255, 106 S.Ct. at 2513–14. However, on a motion for summary judgment, it would constitute reversible error for the court to resolve evidentiary conflicts that might affect the outcome of the suit. *Id.* A trial court may deny summary judgment if "there is reason to believe that the better course would be to proceed to a full trial." *Id.*

### 1. Equal Pay Act violation

■ The Equal Pay Act was enacted for the remedial purpose of rectifying perceived gender-based wage disparities. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974). The statute provides:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. . . .

29 U.S.C. § 206(d). The only exceptions to this policy are if the wage discrepancy is based on "(i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. . . ." *Id.*

■ In order to prevail in a lawsuit brought pursuant to the Equal Pay Act, plaintiffs must establish a *prima facie* case, see *Brennan,* 417 U.S. at 195, 94 S.Ct. at 2228, by demonstrating that "the jobs . . . require similar skills, effort, and responsibilities under similar working conditions." *Molden v. United States,* 11 Cl.Ct. 604, 610 (1987). If plaintiffs can meet this initial burden, the statute presumes discrimination and

requires defendant to proffer successfully an affirmative defense based on one of the four exceptions discussed previously. *See Brennan,* 417 U.S. at 196, 94 S.Ct. at 2229.

■ Defendant has not raised a credible challenge to plaintiffs' establishment of a *prima facie* case. Defendant relies on *Beall v. Curtis,* 603 F.Supp. 1563 (M.D.Ga.), *aff'd,* 778 F.2d 791 (11th Cir.1985) (Table). While *Beall* also involves an alleged Equal Pay Act violation brought by a group of NPs, the case is distinguishable.[4] The court in *Beall* determined that the NP plaintiffs failed to establish a *prima facie* case because the PAs, who were receiving higher wages, possessed certain skills that the nurses lacked. These skills enabled the PAs to participate in a greater number of hospital activities than could the nurse practitioner plaintiffs. Because the jobs at issue did not require substantially equal skill levels, the nurse practitioner plaintiffs failed to establish a *prima facie* case.

In the case at bar, defendant has made little effort to refute evidence purporting to demonstrate that the duties of NPs and PAs are substantially similar. For example, the Portland VAMC advertised for either NPs or PAs. Plaintiffs have also proffered a memorandum dated February 14, 1997, from Arlene Strong, Section Chief, Nurse Practitioners Medical Service, to the Chief of Staff, Portland VAMC stating:

> Both NPs and PAs hold clinical responsibilities as primary care providers. Independently and as members of teams with supervising physicians, both professionals assess acute and chronic medical problems, order diagnostic tests, prescribe medications and therapies, and otherwise manage a wide variety of health problems. Both function in several settings, including inpatient wards and outpatient clinics.

Plaintiffs need not show that their positions were identical to those held by PAs. *Brennan,* 417 U.S. at 203 n. 24, 94 S.Ct. at 2232 n. 24. Because NPs and PAs were apparently fungible at the Portland VAMC, the court finds that plaintiffs have established a *prima facie* case.

---

4. *Beall* is persuasive, not binding, authority.

■ Because plaintiffs have established a *prima facie* case, the burden shifts to defendant to assert an affirmative defense explaining why the pay differential at the Portland VAMC does not constitute a violation of the Equal Pay Act. Defendant had maintained that the wage discrepancy was caused by a factor other than sex—in this case two separate congressionally mandated pay systems. Several rounds of briefing have demonstrated that the success of defendant's affirmative defense will depend on whether the Portland VAMC was presented with documented evidence indicating that the facility was having difficulty recruiting or retaining qualified NPs.

The parties reached this level of understanding as a result of defendant's concession that, even after the implementation of the Nurse Pay Act, the VA retained the authority to create special pay schedules for NPs. This could be accomplished in either of two ways. First, the VA retained the authority to use 38 U.S.C. § 7455—the mechanism through which the PAs received their special salary rate. The VA's ability to utilize section 7455 can be traced to its own circular stating: "[Title] 38 U.S.C. 7451 and 7452 do not discontinue VA's authority to approve special salary rates for employees in covered positions." VA Cir. 00–93–7, att. B, at B–25 (Mar. 7, 1995). The circular cautions that such a course of action will not be frequent and when necessary will be made in accordance with specified VA policy. *Id.* These procedures require expressly that evidence of recruitment or retention problems exists. *See* MP–5, part II, ch. 3, § D, p. 3D–1, ¶¶ 4b, 4c(1)(a) (Dec. 20, 1983).

The second avenue through which plaintiffs could have received a salary increase was via the Nurse Pay Act itself. As defendant demonstrates, 38 U.S.C. § 7451 makes no mention of special salary rates. Yet, in its own construction of the Nurse Pay Act, the VA has established procedures through which a subgroup of nurses, such as NPs, might be entitled to a special salary schedule. "38 U.S.C. 7451 provides that rate ranges for each grade under the LPS [locality pay system] will normally be 133 percent. However, the rate range of any grade may be increased up to 175 percent if such action is necessary to recruit or retain well qualified employees in positions covered by this circular." VA Cir. 00–93–7, att. J, at J–1, ¶ 1.b (May 4, 1993). Accordingly, if NPs can demonstrate recruitment or retention problems, they may be entitled to a special salary rate under the Nurse Pay Act.[5]

Having established that the NPs may be entitled to a wage increase via either of two possible statutory mechanisms, the examination next must address the evidence provided by the parties on the issue of whether a recruitment or retention problem existed at the Portland VAMC during the relevant time period. Defendant—the party bearing the burden of showing a factor other than sex—proffers the affidavits of Barbara A. Walter, Supervisory Personnel Assistant for the Human Resources Management Service, Portland VAMC, and James H. Lee, Chief, Human Resources Management Service, Portland VAMC.

Ms. Walter's affidavit provides a summary of NP staffing at the Portland VAMC for the years at issue. Ms. Walter states that, from November 1992 through March 1997, the number of NPs employed at the Portland VAMC ranged from 34 to 38.[6] Affidavit of Barbara A. Walter, Mar. 20, 1997, ¶ 3.a. Dur-

---

**5.** Defendant argues that federal courts are required to defer to an agency's reasonable interpretation of statutes within its purview. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Although defendant's contention is not open to serious dispute, defendant has missed the point of the instant inquiry. Plaintiffs are not arguing that the VA's interpretation of sections 7455 and 7451 is not reasonable. Instead, they urge an inquiry to determine whether, in light of the VA's reasonable interpretation of the applicable statutes, it acted reason-

ably in choosing not to address the NPs' allegations of recruitment and retention problems. Such a determination does not require the same degree of deference as would, for example, a determination of whether the VA circulars were themselves reasonable constructions of relevant statutes.

**6.** The court notes that Ms. Walter's statistics regarding personnel are inconsistent with those relied upon by the VA in its 1994 internal investigation. *See supra* note 3.

ing this time frame, Ms. Walter states that 17 NPs left the Portland VAMC, 7 full-time NPs were hired, and 14 nurses became qualified and were assigned to NP positions. *Id.* Moreover, Ms. Walter maintains that her analysis of computer records, revealing dates of appointment and of separation, indicated that in 1996 the Portland VAMC took approximately 2 to 4 weeks to fill a NP vacancy. *Id.* ¶ 3.g. Mr. Lee reviewed the statistics found in Ms. Walter's affidavit and concludes:

> The facts contained in Ms. Walter's affidavit are in accord with and confirm my personal knowledge and opinion, as stated in my affidavit of February 21, 1997, that the Portland VA Medical Center has not experienced difficulties in either the recruitment or the retention of nurse practitioners during the more than four years that I have been in my current position as Chief of Human Resources Management Service at Portland VA Medical Center.

Affidavit of James H. Lee, Mar. 20, 1997, ¶ 2.

Plaintiffs produced several counter-affidavits. Ms. Strong, a plaintiff in the case at bar and a former Section Chief for NPs at the Portland VAMC, states that she experienced recruitment and retention problems between 1991 and 1995. Affidavit of Arlene Strong, Sept. 15, 1997, ¶ 2. In addition to this general statement, Ms. Strong provides specific examples of such problems. First, in 1993, salary discrepancies between the Portland VAMC and the private sector resulted in over two months of negotiations with an individual to whom the Portland VAMC had made an offer of employment for a NP position. *Id.* ¶ 2.a. Second, after hiring a qualified NP on a temporary basis—at which point the VA did not have to comply with the existing salary scales—the Portland VAMC found it difficult to recruit this individual when the position became permanent and was required to comply with the Nurse Pay Act. *Id.* ¶ 2.b. Third, Ms. Strong avers that, based on her knowledge as the initial point of contact for available NP positions. on numerous occasions an applicant would cease discussions upon learning the available salary. *Id.* ¶ 2.c.

Other affidavits bolster that of Ms. Strong. Joyce A. Johnson stated that she left the VA for a private sector position paying a salary of approximately 20 percent more than that offered by the Portland VAMC. Affidavit of Joyce A. Johnson, Sept. 11, 1997, ¶ 2. Ms. Johnson also informed the VA that she was leaving because of the higher salaries offered in the private sector. *Id.* ¶ 2. Melody Rasmor makes the same averments. *See* Affidavit of Melody Rasmor, Sept. 10, 1997, ¶ 2. Juanita Muntz declares that, as of the early 1990s, the Portland VAMC NPs were concerned about recruitment and retention problems. Affidavit of Juanita Muntz, Sept. 15, 1997, ¶ 2. Consequently, several NPs prepared and forwarded a memorandum dated October 2, 1992 to the Chief, Nursing Service, Portland VAMC, outlining the alleged problems. *Id.*

Plaintiffs also deposed certain Portland VAMC officials. Until 1995 Joan M. Caley had supervisory authority over approximately 30 NPs. Ms. Caley testified that during the period at issue she had difficulty recruiting qualified NPs. "I was having problems in my role filling nurse practitioner positions. Positions were eventually filled, but it was a long, arduous process, often for a particular program. What should have taken two to four weeks often drug on for many weeks, and the positions were eventually filled." Deposition of Joan M. Caley, July 25, 1997, at 25. Ms. Caley also posited that these problems were related directly to the salaries being offered by the Portland VAMC. *See id.* at 20–21.

Based on the affidavits and depositions proffered by the parties, it is evident that a genuine issue of disputed material fact exists as to whether the Portland VAMC suffered problems recruiting and retaining qualified NPs. Plaintiffs have used the opportunity to conduct limited discovery to their advantage. During oral argument, defense counsel suggested that plaintiffs must produce more than a scintilla of evidence. Plaintiffs have done so. Because the court may not weigh the parties' evidence, defendant's motion for summary judgment must be denied. *See*

*Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.[7]

### 2. *Willfulness*

■ The statute of limitations governing claims for a violation of the Equal Pay Act is 2 years, but if the violation is deemed to have been willful, the statute of limitations is extended to 3 years from the date on which the claim accrued. 29 U.S.C. § 255(a) (1994). The Supreme Court has directed that a willful violation of the Equal Pay Act will be found if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *See McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988).

Defendant contends that the VA's behavior was not willful and that the portion of plaintiffs' claim arising prior to November 14, 1995, is time-barred. Plaintiffs counter with both deposition testimony and affidavits suggesting that the Portland VAMC NPs had brought their salary discrepancy to the attention of the appropriate VA authorities as early as 1992. In her deposition Ms. Caley testified that during meetings at which the nurse recruiter, the chief nurse, and the associate chief nurse were present, the agenda included "the low level of pay [of NPs] in comparison to pay of other nurse practitioners in the community, [and] the low level of pay in comparison to physicians' assistants within our organization." Caley Dep. at 10. Plaintiffs have also produced a memorandum from, among others, Ms. Muntz to Chief, Nursing Service, Portland VAMC, dated October 1, 1992, in which the alleged recruitment and retention problems of NPs were addressed. The court read the memorandum dated February 14, 1992, from Ms.

Strong to Chief, Nursing Service, Portland VAMC outlining the pay discrepancy between NPS and PAs and noting that the NPs believed that the Equal Pay Act demanded a salary equalization. The court cannot weigh this evidence. Consequently, defendant's motion for summary judgment on the issue of willfulness must be denied. Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

1. Defendant's motion for summary judgment is denied.

2. By November 21, 1997, the parties shall file a Joint Status Report proposing a deadline for discovery and a schedule for pretrial filings, the pretrial conference, and trial, not to exceed 5 days.

---

7. Plaintiffs also deposed Mr. Lee. Mr. Lee was presented with the information reviewed by the Portland VAMC prior to granting its PAs a special salary rate. One chart indicated that the Portland VAMC had suffered zero quits for pay-related reasons in the period leading up the request for a special salary rate. Mr. Lee took the position that the evidence was not sufficient to merit a recommendation for a special salary rate. Deposition of James H. Lee, July 25, 1997, at 49.

The importance of this testimony is not that the evidence supporting the PAs salary increase was

weak, but, rather, that once the Portland VAMC accepted such a quantum of evidence, it must do the same for NPs. As the court is ruling on defendant's motion for summary judgment. it expresses no opinion as to the evidence produced by plaintiffs. However, when this case is tried, the court will weigh plaintiff's evidence against that accepted by the VA in awarding the Portland VAMC PAs a special salary rate. Plaintiffs will not be required to produce a greater quantum than that accepted previously by the VA.